Thank you, Your Honors. Mr. Johnson, it's a pleasure to be here today. I'm representing Michelle Wake. I'm James Tree. And Michelle Wake is the appellant on this case for a claim for Supplemental Security Income Benefits. The main issue that was addressed to the Federal District Court and before this Ninth Circuit Court of Appeals is whether or not the Administrative Law Judge's decision that DNA, absent the effects of DNA, is supported by substantial evidence and is free from legal error. That was briefed both before the District Court and before this Court. The Commissioner has argued that part of our briefing in this case should be waived, and we would like to address that particular point as we address the merits of the main issues in this case. The issue is agreed upon by both parties in page 1 of the Commissioner's brief. They indicate the same issue involved. At the District Court, we stated that this was the issue, that the ALJ had not supported his decision that Ms. Wake's only limitations, absent DNA, were that she needed to have superficial contact with coworkers and with the public. And that was it. There were no other limitations that the ALJ gave. And we stated that that was not supported by substantial evidence in the record, those simple limitations, and that it contained legal error. We cited to Ms. Uesting's report, who had been a treating provider, a mental health provider with a master's degree level. We cited the Social Security ruling 0603P that says that there are times when other medical sources' opinions should be given greater weight than acceptable medical sources. In this particular case, Ms. Uesting is not an acceptable medical source but is an other medical source. Social Security ruling 060P says that the ALJ shall put in his decision that, and this is at page six of that ruling, that the reasons for his determination regarding the opinions of the other sources, that he must say what weight he gave the other sources and he must explain with sufficient clarity for a reviewing court and also for the claimant to understand why he's making the decision he did. That's a requirement. That requirement wasn't fulfilled in any sense in this case. If we look at the ALJ's decision, it is 15 pages long, but it contains less than one-half page of weighing of the evidence or giving reasons why the ALJ decided what he did. One of the reasons given by the ALJ was that Dr. Vickers was the treating physician, or a treating physician, and that Dr. Vickers had reported in his view that if the drug and alcohol problem were taken care of, she could probably return to work within two to six months. You say, and I see that it's true, when Dr. Vickers wrote that, it was the first time he'd ever seen her. So at that point he had no experience with her whatsoever. Can you give a sense as to Dr. Vickers' views of her after that initial meeting? What I'm trying to figure out is whether or not it's appropriate for the ALJ in this case to give the presumptive weight that's ordinarily given to the opinion of a treating physician, given that this opinion was given at the time of the first visit and that he continued to treat her thereafter. He did say after the fact that he said that her primary condition is her borderline personality disorder. Secondary to that is drug addiction and alcoholism. But he never changed his view, though, about that if she were treated for drug abuse, she'd be able to work. He never retreated from that after seeing her later, did he? No, he was never asked that, but he only saw her about four or five times. The question is, did he give a view, express a view after the first meeting? No, he didn't, either retracting or supporting his opinion. He's a family practice physician. He's not a psychologist or psychiatrist. She went in to see him for some physical problems. He noted that she had some mental disorders, noted it in the record, and said on that first visit, I think she could become employable in two to six months. A big problem with that, though, is he did not know anything about her personality disorder. She was diagnosed both from Dr. Taves, who was the consulting examiner, with a borderline personality disorder, and also by her treating providers with borderline personality disorder. It's up to the ALJ to determine how much weight to give to any of the medical providers. That's not something that we can say should or should not have been counted in a particular manner, is it? I think it is because the law clearly requires the ALJ to weigh the evidence and to give specific reasons to each witness. Right. He didn't do that. Yeah, but I'm just saying, though, we can't say because the physician is a family physician or because he only saw her one time that the ALJ can't rely on the opinion that was given, can we? Well, the ALJ needs to give reasons in his decisions of why he's doing that. I suppose the ALJ could have said, I've looked at Social Security ruling 06-03-P, and it tells me that in some circumstances I should give greater weight to Ms. Uesting because she's seen her more times. Her specialist is in mental health, and she knows about the personality disorder, and Dr. Vickers doesn't know about the personality disorder. He's a family practice physician. He only saw her a few times. Nevertheless, I'm rejecting Ms. Uesting's opinions for these reasons, and none of that happened. None of that happened. And we only left with post-hoc rationalizations. I want to interject here. You talked about a later, I don't know whether the right word is diagnosis, but a later statement by Dr. Vickers, and I'm not sure you stated it correctly. The first time around, he meets her on the 14th of October in 2005, and it's at that meeting he writes that little handwritten note about two to six months. He then meets her again about two weeks later on the 1st of November, and you referred to this, but I'm not sure you described it correctly, A1, medically disabled, currently with bipolar affective disorder. So he says she's bipolar, being the primary, and drug use being the secondary diagnosis. That at least suggests to me that now that he's actually met her and talked with her, and the text here supports this, that he thinks the primary problem is an underlying psychiatric problem, not a drug or alcohol abuse problem. So my question now is, was Dr. Vickers ever specifically asked in connection with this application, what is your current diagnosis of Ms. Wake? No. So all we have is these notes that he's compiling for his own purposes, and he might have thought better of his initial impression of her, but we're never asked really what his evaluation is after he's been treating her for a time. We just don't know. Yeah. Except as we might infer from statements that show up later in his treating records. Yeah. Okay. That happens all the time, doesn't it? The ALJ has to go through the medical records and ascertain, you know, what the effect of the various notes and opinions and survey, that's what happens in a social security case. The treating physicians and the consulting physicians, they're not generally, all of them are not brought into the ALJ for the ALJ to question them. The ALJ goes through the medical records and weighs and sifts and makes a determination. That is what's supposed to happen. That didn't happen in this case. Right. But it's not usual for all of the doctors to come in to the hearing to be asked about their opinions, is it? No, but the judge does have a specific duty, if there is an ambiguity in the record, to clarify that ambiguity, even when the claimant is represented. Further, the ALJ- But not by bringing in all of the- Could be by interrogatories. That's not usual. It happens. Yeah, but it's not usual. But what is usual is the ALJ does give specific reasons for each witness. He didn't do that in this case. There's no way that we can say that he did that. He's completely absent on it. Dr. Vickers did say she was medically disabled by the primary bipolar disorder. That doesn't help a lot in this case, because you still have to filter out what effect the drug use had on the disability. That's the problem. And Ms. Uesting's report is real important on that, because she says what are the effects of the drug abuse on her conditions, and she said none when she reported to her. Remember, when she saw Ms. Uesting, right before that she'd been in inpatient treatment, immediately followed by extensive outpatient treatment. She saw Ms. Uesting when she was clean and sober. Ms. Uesting says, I've seen her when she's clean and sober. There's no effects to drug addiction and alcoholism from my limitations that I give on this report. Those reports were presented to the vocational expert who testified that a person could not work with those limitations. That was clearly absent DNA. Mr. Johnson, in his brief, said the ALJ accepted Ms. Uesting's report. If it's true that the ALJ accepted Ms. Uesting's report, then she should be found disabled, because clearly in her own words she said this is without DNA. No effects from it. She was clean and sober during that time. The emergency teletype requires that the ALJ weigh any period of one month's sobriety or more. There's many of those periods in this record, and the ALJ failed to mention them, failed to mention whether or not he was weighing them, what effect he'd given. Yes, he could weigh them, and he could have ruled that he could have perhaps denied her properly if he had weighed the evidence, but he didn't. There's no weighing of any of this evidence in this record. It's very devoid from an ALJ. It's very unusual to have a 15-page decision with less than half a page of weighing of the evidence with no comment on any of the witnesses. Thank you, Your Honors. Good morning, Your Honors. David Johnson for the Commissioner of Social Security. I'd like to first address the statement that Dr. Vickers was not asked what he thought Ms. Wake could do despite her impairments, and regulatorily we know that that's not the standard. That's not correct. By regulation, when a request for medical records is sent to an acceptable medical source, the acceptable medical source is asked for their opinion. They often do not provide their opinion about what someone could do despite their impairments, and Dr. Vickers in this case did not, otherwise it would be in the record. Now, did he specifically say, I'm not providing it? What do you mean when you say he didn't do it? Usually, in this case, he just sent his medical notes, and that's typically what happens. And do I have a copy of the letter that was sent to him so I know what was requested of him? No, Your Honor. That is not in the record. So, I mean, if the notes to him says, send us your medical treating records, he did that. If the note to him says, give us your current assessment, that's quite a different proposition. So what does the note say? The note says both by regulation. But you don't have a copy of the note. I can look at it. I do not. And the government doesn't always follow its own regulations. I will admit that. Okay. But, Your Honor, there's no evidence here that we did not, and But it seems to me there's not a lot of evidence that you did either. Is that the practice of the agency to do that? It is. It's the business practice. It's the routine practice. It's the regulatory practice. We have form letters. I do not have the particular form in this record. So I may be belaboring a point that, in the end, is not all that important, because Dr. Vickers' treatment records are what they are. What I'm resisting is giving to Dr. Vickers' first evaluation of the patient at the time he sees the patient, presumptive weight that's ordinarily given to the opinion of the treating physician, because the reason we give such presumptive weight to the treating physician is that the treating physician knows this patient, has treated the patient over some period of time, and we trust that person more than someone who meets her for the first time. And so now we've got several treating notes, but the one that you keep relying on, and I understand why you're relying on, is the one that he sees for the first time. So I don't want to say it's not important or that we put it to one side. I just want to say it's not your typical treating physician's note that we get after a sustained period of treatment. In this case, well, we give treating physicians more weight because they have a better opportunity to know through their treatment relationship. Exactly, sure. In this case, we have more than just Dr. Vickers' first treatment note and his subsequent follow-up notes. We have Dr. Toews, who performed a consultative exam. Let's just stick to Dr. Vickers, though. All right. I think Judge Fletcher's concern was perhaps his view changed over time from the first treatment note to the subsequent treatment notes, and that's not reflected in the record. What's your response to that? It's possible that Dr. Vickers' view changed over time. Well, I think it did if I look at his treatment notes from two weeks later, where he has at the very beginning in block capital letters, medically disabled, currently with bipolar affective disorder being the primary, and drug use being the secondary diagnoses. That's not elaborated, so I don't quite know what he means. But the first treatment, the first note when he says, can return to work after two to six weeks, that's pretty brief, too. Medically disabled is Dr. Vickers' own term. It's not a legal term, but it's Social Security Act use. And return to work in two to six months is his own term, too. That's right, it is. And the fact that she has a secondary diagnosis doesn't indicate that the two are mutually exclusive and don't influence each other. Of course. It's up to the ALJ, who found her disabled based on all of her impairments, to separate out the drug and alcohol-related impairments from the non-drug and alcohol. Let me ask you a different question, and that is the ALJ finds her not entirely credible. That's correct. And it gives two grounds for that. That's correct. Number one, that she's maybe not talked honestly about the scope of her current drug usage. And number two, that she's not sought treatment. Not participated, correct. Well, let me read it. Not completed, perhaps. Yeah, let me read it so I can quote it exactly. Not fully credible. And then toward the end of that same paragraph, obviously, it says records show she is medically non-compliant, even though she testified that medication and therapy would have helped and she has improved. On that second one, that's an absolutely standard and, I think, quite probative view when the person's ailments are physical. The guy says, listen, I've got a bad back and it's just killing me. And the medical records show he hasn't been to a doctor for three years. That's a pretty good reason to think that he may be lying or at least exaggerating about the extent of his pain. But when we have mental difficulties, it is very common for people with mental difficulties not to seek treatment. They don't recognize them or sometimes the extent of the mental difficulty is such that the mental difficulty itself impedes or prevents them from seeking treatment. I don't find, given that the underlying difficulty that's at issue here is mental, I have to say I don't find that second ground very useful. Can you respond to that? I think it would be contrary to precedent to ignore all mental impairments, I'm sorry, ignore all lack of treatment situations when there's a mental impairment. Burt was a situation where depression... I don't want to go that far, but I do want to say that this is really different from someone who fails to seek medical treatment for a physical ailment. Absolutely. It's most clear when you complain of pain and don't go to the doctor to do something about your pain. It's much less clear when we're dealing with mental impairments because it does affect your thought processes. And people who are depressed are notoriously unable to seek treatment. It's in our case laws, it's in the medical literature. Nevertheless, in Burt it was found to be an acceptable credibility factor that the ALJ could weigh despite the presence of depression. I've got another problem with his credibility finding, and that is I think he's required to tell us if he intends to rely on the adverse credibility finding, okay, what is it that he doesn't believe? Because he doesn't tell us what he doesn't believe. There's variance in the case law. A general credibility finding is perfectly acceptable. Some cases do require precision, a litany. You said this, you're not credible about this because, therefore, I disbelieve this sentence. We certainly know from his credibility finding that her reports of drug and alcohol use and abstinence are not reliable. Dr. Toews also had that opinion. No, I'm not fussing about that part of it. Okay. But that happens to be the basis for Mr. Clark and Ms. Usatin's opinions, moderate to marked limitations, and they thought that she was abstinent from drugs and alcohol. I'm sorry. The problem with that is the ALJ didn't tell us anything about those two providers and why he discounted their opinions. So how can we rely on his opinion if he totally ignored that evidence that was in the record? If he totally ignored it, you could not, unless it was not significant or probative, and that's another argument. But in this case, he did not totally ignore it. He discussed their opinions throughout his decision. When he got to the conclusion portions of his opinion, both at ER 22 and at 24, he summarized that the opinions of moderate to marked limitations are not present when she's not using drugs and alcohol. I don't think that's good enough under our case law, is it? It is. What case are you relying on to say that a reference, a veiled reference to the providers is sufficient weighing of their opinions? Certainly, Gonzales v. Sullivan provides that a four-page evaluation of the evidence is sufficient to know that the ALJ didn't merely disregard the evidence. Yes, but he didn't evaluate the evidence. He discussed it and described it in his sort of background. And Lockwood tells us that that also is sufficient. It's sufficient to meet his obligation to weigh the various providers and why he gave more weight to... To weigh and reach conclusions. If he were going to reject Mr. Clark and Ms. Usatine's opinions of moderate to marked limitations, he needs to give specific reasons or maybe even clear and convincing reasons, all of which need to be supported by substantial evidence. But if he's going to say, look, I accept their moderate to marked limitations, which is what he said, but also I know things they don't. I heard her testify. I'm reading other evidence that they didn't have. And based on all of that, the record as a whole, I find she's not credible and her claims to them are not credible. It would have been nice if he had specifically discussed each one of them. I mean, I think that's generally what we see, is that the ALJ specifically discusses each provider and says, here's what they said, here's why I credit it, here's why I don't credit it. I take this portion, not this portion. Exactly. That's typically what we see, and when we see that, we know without a doubt that the ALJ has considered all the evidence. When it's jumbled all together, we don't, I don't, I shouldn't speak for the other panel members, I don't have a sense of confidence that the ALJ has really considered all of the evidence. And the claimant is entitled to that. We shouldn't guess as to whether the ALJ has considered all the evidence, because this is a claimant's shot at getting benefits. This is her third shot, absolutely, and she's entitled to a fair hearing, consideration of all the evidence. The thorough discussion of the evidence before the conclusions shows that evidence was not overlooked, and it's not. Well, it's, it's, you know, there is a thorough discussion of the evidence, but the, you know, what, the weight you give the evidence depends on what weight you give the doctor's testimony or the witness's testimony. And you explain why, for instance, you know, the conflict between doctors, you explain why you take one and not the other. And you announce or you state in the opinion with respect to a witness's testimony that you're disregarding why you're not giving that weight to that testimony. It's not enough just to list all the testimony there is and say, well, looking at all the testimony, I find that she's disabled. You have to say, as I understand the case law. I don't, I don't think that's accurate, Your Honor. No. I think a thorough summary of the evidence, along with conclusions and reasons for those conclusions. But what's the reason for the conclusion? She lacks credibility. If you don't know, if you don't know how much weight you give to the witness. And lacks credibility as to what? If she lacks credibility in the sense that she may be minimizing the extent to which she has used drugs in the past or maybe is using now, that doesn't tell me at all that he, that the ALJ is saying, when she was evaluated by, for example, Nurse Ursotine, she was clean or not clean. I mean, I need him to tell me. What is it you don't believe? Because unless you're telling me you don't believe that she was clean when that evaluation was made, you're telling me that she's not fully credible doesn't tell me a darn thing. I think that his direct link of her lack of credibility about her substance abuse, as you discussed, combined with the finding that the moderate mark limitations are not supported by the bulk of the evidence when she's, I'm sorry. The fact that he found her not credible regarding her substance use, and the fact that... Not fully credible. Not fully credible, absolutely. So in other words, she tells the truth sometimes. Mm-hmm. Combined with the fact that Mr. Clark and Ms. Ursotine only had what she was telling them and what they could see of her meant that their observation about her clean and sober status was inaccurate or at least unreliable. If he'd said that, if he'd said what you just said, I might be more inclined to trust what he said, but he doesn't say that. Let me ask you something else, though, and that is, one of the arguments made here is that the two, Dr. Toews and Dr. Gardner, did not break out what part of her disability is due to drug and alcohol and what part is due to some underlying medical disability. Do you disagree with that characterization of those two doctors' assessments? I do. Because, I mean, I read them. I don't see them breaking it out. Dr. Gardner lists specific limitations and then has a specific sentence about what would be worse, that is, increased poor mood and decreased attendance reliability. What page are you on? That 163, active substance abuse. Hang on a second. I'm slow. Oh, you're fast. Sorry. That's okay. Okay, I'm with you. I'm now. I'm on that page. The first typed paragraph that's filled in on the form, the last sentence, active substance abuse would disrupt attendance and exacerbate mood disturbance. Right. So that's one. That does not tell me what degree of disability she has without the drug abuse. It just says the drug abuse will increase it. We all understand that. That's common ground for everybody. Okay. Attention and concentration are intact. She can attend to and persist on tasks. And he goes on with other things that she can do except she can carry out, and I'll insert the word only here, superficial task-related social interactions. And that's the limitation, the ALJ included, that she can't do jobs that require more than superficial task-related social interactions, even in a clean and sober state. No, he doesn't say even in a clean and sober state. The ALJ does. It's a two-parter statement. The ALJ says it, but he doesn't. Even if the job. No, I'm asking you, not what the ALJ says. I'm asking you about Gardner and Toews. What do they say in terms of what she's like without drug and alcohol so that we can, I mean, I understand what the law requires. The law requires that we assess the disability without regard to drug and alcohol. And I'm trying to figure out if Gardner and Toews are giving us that assessment, and I have trouble finding it in either of their assessments. You do have to draw an inference that. Well, I have to make it up. Pardon me? I have to make it up. It's just not there. I'm sorry, Your Honor. I believe that it's a reasonable inference that even if you don't draw the inference, the ALJ's residual functional capacity finding included the limitations Dr. Gardner opined, except for the sentence about active substance abuse disrupting mood and attendance. It included, even if those are drug and alcohol related, your argument leads to the conclusion that she would be even more capable. She could do more than superficial interaction if she were clean and sober. So if all these are drug and alcohol related, she is most certainly not disabled. But even giving her the benefit of the doubt and saying only the sentence about mood and attendance is drug and alcohol related, only that would go away if she were clean and sober, the ALJ's decision is supported by more than a scintilla of evidence. Thank you for your time. Thank you, counsel. Case just argued will be submitted.
judges: Reinhardt, Fletcher W. , Rawlinson